FEDERAL LAND BANK OF ST. LOUIS *v.* RICHLAND FARMING COMPANY.

Opinion delivered November 18, 1929.

*W. H. Bengel,* for appellant.
*Oliver & Oliver,* for appellee.

BUTLER, J. G. W. King was indebted to the appellant on the first day of February, 1923, in the sum of $3,700, bearing interest at the rate of 5½ per cent. per annum, evidenced by his promissory note of that day, payable in sixty-nine annual installments, and, to secure same, on the 22d day of February, 1923, executed and delivered to the appellant his mortgage, conveying to it a farm containing 240 acres of land in Clay County, Arkansas. G. W. King was also indebted to the appellee company in the sum of $2,700, evidenced by his promissory note for that sum, and executed, on April 2, 1923, his mortgage on the same lands as that contained in his mortgage to the appellant bank to secure said note, which mortgage, however, stipulated that it was subject to the prior mortgage aforesaid.

The facts in this case are not in dispute, and such as are necessary for the determination of the questions presented may be briefly stated as follows: The semi-annual payments due appellant were promptly made each year down to and including the payment due in August, 1928, which payments were made by G. W. King, the mortgagor, and by the appellee company. Just which of the payments were made by the appellee company is not shown. During the years 1924, 1925, 1926 and 1927 the appellant bank made an inspection of the records of the collector of revenue in order to ascertain if the taxes due on the lands were being regularly paid, and also (the lands being embraced in a drainage improvement district) to ascertain if the drainage assessments were being paid, there being a stipulation in the mortgage executed by King to it that, should the mortgagor fail to pay the taxes and assessments, the mortgagee might, at its option, declare the entire debt due and proceed to foreclose its mortgage.

The taxes and drainage assessments were regularly paid each year for the years 1924, 1925, 1926 and 1927. The records kept by the collector of revenue showed the taxes for all of said years were paid by the mortgagor,

G. W. King, and that the drainage assessments for the years 1925 and 1926 were paid by the same party, and for the years 1924 and 1927 were paid by the appellee. The receipts issued by the collector correspond with the records. While the records and receipts showed payment of taxes and assessments for all of said years, except the assessments for the years 1924 and 1927, were being paid by the mortgagor, King, they were in fact being paid by the appellee company, which, during that time, was collecting from the mortgagor various sums and applying same to the indebtedness due it by said mortgagor. It collected and made application as aforesaid the sum of $670 on January 1, 1924, $480 January 1, 1925, $160 July 1, 1928, and $225.58 January 1, 1929. This last credit was for rents for the year 1928 collected and appropriated by the appellee company; from what source the prior credits were obtained by appellee is not shown.

The appellant bank had no actual notice prior to December 15, 1928, that the taxes and drainage assessments had been paid by the appellee. In January, 1929, appellee brought this suit, alleging that it had paid the taxes and drainage assessments aforesaid to protect the lien in its favor; that said taxes and assessments constituted liens on the land paramount to the rights of the appellant, and prayed for subrogation, judgment, foreclosure, et cetera. To this complaint the appellant filed its answer, and afterward the appellee filed a response thereto.

Upon these pleadings and agreed statement of facts the case was submitted to the court. The court found by its decree that the appellee was entitled to be subrogated to the State and drainage district liens for taxes and assessments, gave judgment for the amounts of said items paid by the appellee company, less $225, rents collected for the year 1928, et cetera. The total amount of general taxes paid by the appellee company for the years above mentioned was $138.94, the total amount of drain-

age assessments for said years $1,120, which sums, together with interest, amounted to $1,466.33, from which the court deducted the item of $225 rents collected in 1928, leaving a balance of $1,241.33, for which judgment was given and declared to be prior and paramount to the lien of the appellant. From that decree both parties prosecute this appeal.

The appellee, plaintiff below, brought his action on the theory that it was obliged, in order to protect its interest, to discharge certain general taxes and drainage assessments due on the lands included in the mortgage given to the appellant bank and to it, and is therefore entitled to be subrogated to the paramount liens of the State and drainage districts in the amounts of the taxes and assessments paid by it. Undoubtedly a junior mortgagee who in good faith pays taxes due to protect his lien may be subrogated to the State's lien therefor and recover the amount paid, even as against the prior mortgagee. *Ringo* v. *Woodruff,* 43 Ark. 469; *Lester* v. *Richardson,* 69 Ark. 198, 62 S. W. 62. But, as the doctrine of subrogation was evolved by courts of equity for the prevention of injustice, it is administered not as a legal right, but the principle is applied to subserve the ends of justice, and to do equity in the particular case before the court. Therefore no rule can be laid down for its universal application, and whether it is applicable or not depends upon the particular facts and circumstances of each case as it arises, and is subject to that most ancient maxim, "he who seeks equity must do equity."

A consideration of the nature and purposes of this benevolent creation of the courts of equity and a comparison of its principles with the inferences implied in the facts of the instant case make it apparent that it can have no application here. *Flowers* v. *Bricker,* 178 Ark. 764, 12 S. W. (2d) 394. In all the cases cited by the appellee there was no element of *mala fides,* but this cannot be said of the case now before us. While the appellee, perhaps, was not motivated by a conscious intention to

deceive the senior mortgagee and thereby gain an advantage, yet such was the necessary result of its conduct. There was a concealment, whether intentional or not, of an important fact, namely, that the mortgagor was not in fact the person who was discharging the taxes and drainage assessments, and the appellant was, because of this, lulled into a sense of security, and prevented from exercising its judgment as to what procedure it would take to protect its own interests. On account of its lack of knowledge of the default, and, further, by reason of the semi-annual payments made by King and the appellee, it was deceived into the belief that its security was unimpaired except from natural causes, and that it had no right to ask for a foreclosure of its mortgage if it so desired. During this time, and while the appellant was unaware of the true situation, appellee was making use of its superior opportunities and collecting yearly sums materially lessening its debt, and, judging by its subsequent conduct, was attempting to secure by a lien superior to that of the appellant the sums it was yearly paying in taxes and drainage assessments, while all the time the security was depreciating in value—so much so that, while at the date of the giving of the two mortgages to the appellant and the appellee, it is probable it was thought ample security for both, it now is worth less than the appellant's debt and the taxes and assessments for the years for which appellee has made payment. Appellee knew the mortgagor was not discharging the general taxes and assessment liens, and the appellant did not; if it thought appellant, as senior mortgagor in that state of the case, was obligated to pay the taxes, it certainly ought to have notified it of the delinquency and given it the opportunity to do so. Instead of this, it voluntarily assumed the burden.

Appellee argues that the appellant bank was not misled, because an examination of the record of the collection of drainage assessments for 1924 and 1927 would have disclosed the fact that the payments of the assess-

ments for those years were made by it, and not by the mortgagor, King. A sufficient answer to this contention is that in the year 1924 appellee secured from some source and by some means a payment of $670, and the regular tax records showed the payment of the general taxes by King, and, as the assessments for the following years, 1925 and 1926, were shown by the records to have been paid by King, appellant might have reasonably concluded that there had been some understanding between appellee and King for this payment; especially as the semi-annual payments of its accrued interest and principal were paid by King and the president of the appellee company, and because no complaint was made of the mortgagor's failure to make the assessment payment for that year. What is said of the 1924 payment of the drainage assessment applies to that of the year 1927, for, from all of the information available, the appellant might have naturally assumed that, if the appellee was paying these two assessments in an honest effort to protect its lien, it would have given notice of some kind to the appellant bank. When the appellant made examination of the tax records and found the general taxes for each year paid by the mortgagor, it must have assumed that the drainage assessments were also paid by him, as it had no actual knowledge otherwise until December 15, 1928.

The appellee also contends that the falsity of the records was the act of the collector of revenue, for which it ought not to be held responsible. While the actual notation was the act of the collecting officer, still the appellee must have known of this, as the receipts issued and delivered to it contained the false statement of the record, viz., that the taxes and assessments were paid by King. It is also reasonable to presume that the appellee not only knew, but directed the receipts to be made in the name of King; for one does not usually accept payment by one person and issue the receipt to another without some authority for so doing.

The decree is reversed, and cause remanded, with directions to enter a decree conforming to this opinion.